STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant Arteaga

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No.: CR 19–426 WHO |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| BRAYAN ARTEAGA, | **Court:** Courtroom 2, 17th Floor<br>**Hearing Date:** February 27, 2020<br>**Hearing Time:** 1:30 p.m. |
| Defendant. | |

**INTRODUCTION**

Brayan Arteaga, a young man who came to the United States from Honduras seeking opportunities to better his family's life circumstances, is now before the Court for sentencing on a single $16 sale of crack cocaine. The unrest and turmoil in Honduras has created an environment in which vast swaths of the country's population live in abject poverty. Under those conditions, Mr. Arteaga had to grow up before he hit his teens. He is only 22 years old, but has borne the responsibility of helping to support his mother and two younger siblings ever since poverty forced him to drop out of 5th grade. He has a limited criminal record consisting of only one prior misdemeanor conviction, and faces substantial immigration consequences as a result of the instant matter. For selling one crack rock, he will not only be subject to near-certain deportation back to Honduras, but will be ineligible for numerous avenues of relief in immigration proceedings and will become permanently inadmissible to the United States in the future.

Mr. Arteaga takes responsibility for his actions and understands that he must face consequences for what he has done. He respectfully requests that the Court vary downwards and impose a sentence of time served. Such a sentence is appropriate, given Mr. Arteaga's background, the severity of the immigration consequences, and the conditions in Mr. Arteaga's home country.

**ARGUMENT**

**I.   A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

In sentencing Mr. Arteaga, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

directs the Court to consider a number of additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Pursuant to the plea agreement in this matter, the parties have agreed to a final offense level of 10. Though not included in the written plea agreement, the government and undersigned counsel also agree that Mr. Arteaga's Criminal History Category is II. The resulting advisory Guidelines range is 8–14 months.

### A.   The nature and circumstances of the offense

Mr. Arteaga was arrested as part of the government's Federal Initiative for the Tenderloin ("FIT") targeting cases arising in the Tenderloin for federal prosecutions, many of which involve relatively minor drug offenses that normally would be prosecuted only at the state level. Along those lines, Mr. Arteaga's conduct in the instant matter consisted of selling a single rock of crack cocaine to an undercover San Francisco Police Department ("SFPD") officer in exchange for $16. The total amount of crack involved was less than 2.7 grams.[1] This offense was a quintessential street-level drug sale that did not involve violence, weapons, possession of large quantities of controlled substances, or other aggravating factors.

Mr. Arteaga filed no motions in the case, and took the earliest possible opportunity to plead guilty at his first appearance in District Court. The Court should take into consideration such timely and extraordinary acceptance of responsibility.

### B.   The history and characteristics of Mr. Arteaga[2]

<u>1. Mr. Arteaga's personal background</u>

---

[1] The DEA-7 form provided in discovery lists the gross weight as 31.2 grams. After subtracting 28.5 grams to account for standard DEA packaging, that leaves an approximate original gross weight (including packaging) of 2.7 grams. The exact net weight is unknown but would be even lower than that.

[2] Because of expedited sentencing in this matter, there was no pre-sentence interview. To assist the Court in its determination of an appropriate sentence, undersigned counsel will include in this section

Mr. Arteaga was born and raised in Escanito, a small town in the department of Francisco Morazan, in Honduras. His biological father was largely absent from his life—from what Mr. Arteaga can remember, his father was only with the family until he was around two or three years old. After that, Mr. Arteaga's mother raised him and his siblings. Mr. Arteaga would occasionally see his biological father around town in subsequent years, but they had no meaningful relationship; his father did not help to care for him or the rest of the family, and did not provide any financial support.

Mr. Arteaga grew up with one younger brother, Dixon, and one younger half-sister, Elisa. He also has five other half-siblings through his father but he did not grow up with them and knows very little about them. Elisa's father stayed with the family for about two years, during which he helped contribute financially to the household through manual labor (carrying sand) until he injured his leg and was unable to work. For his early childhood, then, Mr. Arteaga and his siblings relied on his mother to keep a roof over their heads and to put food on the table. Because of the lack of opportunities and widespread poverty in the area, Mr. Arteaga's mother was only able to support her children by selling eggs. This made life difficult for the entire family, and Mr. Arteaga remembers times when food was scarce.

When Mr. Arteaga was 12 years old, he lost one of his closest friends in an unexpected car accident. The day it happened, there was a lot of dust on the road, making it difficult to see. Under those conditions, the car in which his friend was a passenger crashed into another car. His friend flew out of the car, hit a pole, and died from the impact. This was a person who had grown up next door to Mr. Arteaga and for years, they had spent all their time together. Mr. Arteaga remembers feeling overwhelmed and depressed in the aftermath of his friend's death, but did not receive any counseling to help him process the trauma.

Due to his family's financial struggles, Mr. Arteaga had to leave school in the 5th grade and has never had the opportunity to finish his education. From that point forth, as the oldest son, he was responsible for helping to raise his siblings and to support the household through odd jobs whenever possible. Because of Mr. Arteaga's own sacrifice at such a young age, his siblings were able to stay

information normally obtained in a pre-sentence interview.

in school for a significantly longer period of time than he himself was able to complete. Dixon recently finished his schooling, and Elisa made it through most of high school. Mr. Arteaga would like to resume his studies in the future, but is pessimistic that he will be able to do so—rather, he expects that he will have to continue working to earn money for his family. That pressure was also what motivated him to come to the United States in the first place about two years ago in search of better economic opportunities. *See* Declaration of Angela Chuang in Support of Defendant's Sentencing Memorandum ("Chuang Decl."), Ex. A. Since he has been in the Bay Area, he has lived with his mother's friend in Oakland and also with friends. His mother's friend was able to help him find work in the form of assisting her with her freelance cleaning business. When there was work available, he could earn $100–120 per day and he would then send money back to his mother. Unfortunately, that was not a regular occurrence and sometimes weeks would pass with no cleaning jobs at all. Not only did that mean no money to send back to his family, but it also meant that he had no money to support himself here. To add to the stress, Mr. Arteaga's mother suffers from a chronic illness characterized by the appearance of large lumps in her abdomen and thighs; her condition requires that she receive monthly injections as part of her treatment.

It is under these desperate financial circumstances that Mr. Arteaga became involved in the criminal conduct related to the instant offense. He felt enormous pressure to earn money to send to his family, but experienced difficulties finding steady work. Doubtless, his involvement in selling drugs exhibits incredibly poor judgment, and he regrets that he ever allowed himself to start down that path. *See id.* He has already started to plan what he will do in the future in order to continue to support his family as he has done since he was 10 years old. To that end, after his likely deportation back to Honduras, he wants to return to his hometown and start a motorcycle repair shop.

Mr. Arteaga's criminal record is minimal, consisting of only one misdemeanor conviction in 2018 for Accessory After the Fact. Because the applicable Guidelines range is in Zone B of the Sentencing Table, the Court may impose a term of probation with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention. *See* U.S.S.G. § 5B1.2 n.1(B). However, as Mr. Arteaga does not have permission to be in this country, he is not eligible for any of those preferable alternatives to imprisonment expressly recognized in the

Guidelines. This Court should remedy this disparity in alternative sentences by varying downwards.

### 2. Immigration consequences for Mr. Arteaga

It is almost certain that Mr. Arteaga will be deported following resolution of the instant matter, but the immigration consequences do not end there. Because of the nature of the charge, this conviction will come with draconian penalties. Almost every avenue for relief that he otherwise would be able to pursue as a potential defense in immigration proceedings will no longer be available to him. Most severely, he likely will be rendered permanently inadmissible to the U.S., meaning that he will be barred from re-entry for the rest of his life.

### 3. Conditions in Honduras

As set forth above, Mr. Arteaga first came to the United States from Honduras because there was no realistic opportunity of gainful employment there, which can be attributed in large part to the gang violence that pervades the country. Although this fact does not excuse Mr. Arteaga's criminal conduct, it does provide an important perspective, especially when considering the role in creating those violent conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL (available at https://www.osac.gov/Pages/ContentReportDetails.aspx?cid =23798) [hereinafter 2018 Crime & Safety Report]; *see also* Gangs in Honduras, INSIGHT CRIME (available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf) [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war."). Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world.[3] Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america/); *see also* Gangs in Honduras at 1. According to the 2017 State Department Human Rights Report, violence in Honduras includes "murder, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2017, Honduras,

---

[3] Mr. Arteaga's hometown is within 50 miles of Tegucigalpa, which is the closest city.

U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR (available at https://www.state.gov/documents/organization/277585.pdf) at 1.

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS (available at https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf [hereinafter Crime and Violence] at 1–2. In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the most recent Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017) (available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression). Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country and why many are fleeing in hopes of creating more sustainable lives.

Gang violence is also responsible for the violence throughout Honduras. Since the 1990's, the United States has played a significant role in Honduran gang culture. *See* Gangs in Honduras at 1. Mara Salvatrucha (MS-13), the 18th Street gang (M-18), and Barrio 18, three gangs that originated in Los Angeles, are now three of the most prevalent gangs in the country. *See* Clare Ribando Seelke, Gangs in Central America, CONG. RES. SER., 3 (Aug. 29, 2016) (available at https://fas.org/sgp/crs/row/RL34112.pdf); *see also* Gangs in Honduras at 1. These gangs expanded

into Honduras after the United States passed legislation in 1996 that led to the deportation of many undocumented immigrants with criminal records. *See* Gangs in Honduras at 1. Although sources vary as to how many gang members are currently active, estimates range between 5,000 to 36,000 members. *Id.* at 7. These U.S.-based gangs, along with local gangs, use extortion and violence to control territories and comminutes. *See* Crime and Violence at 1–2; *see also* Rocio Cara Labrador & Danielle Renwick, Central America's Violent Northern Triangle, COUNCIL ON FOREIGN REL. (June 26, 2018) (available at https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle) [hereinafter Central America's Violent Northern Triangle]. As a result, life in Honduras is tenuous, and many people like Mr. Arteaga have fled the country in order to find a life where they can be safe and find economic opportunity. *See* Central America's Violent Northern Triangle.

**CONCLUSION**

For all the reasons set forth above, Mr. Arteaga respectfully requests that the Court impose a sentence of time served. He does not have any financial assets and therefore is requesting that any fine be waived. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:   February 14, 2020          Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

          /S
ANGELA CHUANG
Assistant Federal Public Defender

DEF'S SENT. MEM.
*ARTEAGA*, CR 19–426 WHO